1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7     PATRICK DEWIN MCDANIEL, SR.,
                                              Case No.  13-cv-02804-JST (PR)
            Petitioner,
8
         v.
9                                             ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS;
      RON BARNES, Warden,                     DENYING CERTIFICATE OF
10                                            APPEALABILITY
            Respondent.
11

12

13          Patrick McDaniel, Sr., filed this pro se action seeking a writ of habeas corpus under 28

14   U.S.C. § 2254.  Respondent has filed an answer to the petition, and Petitioner has filed a traverse.

15   The matter is now before the Court for consideration of the merits of the habeas petition.  For the

16   reasons discussed below, the petition is DENIED.

17                              **I. BACKGROUND**

18          On October 7, 2009, Petitioner was found guilty by a Lake County jury of attempted

19   voluntary manslaughter; assault with a firearm with personal use of a firearm and infliction of

20   great bodily injury; possession of a firearm by a convicted felon; possession of ammunition by a

21   convicted felon; and carrying a loaded firearm in a public place.  Docket No. 12, Ex. 1 ("CT") at

22   1331–32. The jury acquitted Petitioner of the more serious charge of attempted murder.  Id. at

23   1078.  Petitioner also pled guilty to possession of narcotic substances.  Id. at 1331–32.  On

24   November 24, 2010, the trial court imposed sentence in this case and two trailing cases, Lake

25   County docket numbers CR913150 and CR918109 and sentenced Petitioner to an aggregate term

26   of 20 years.  Id.

27          Petitioner directly appealed the judgment in the California Court of Appeal, Docket No.

28   12, Ex. 3.  The appellate brief argued that the trial court erroneously excluded one witness's 1990

indecent exposure conviction; the trial court erroneously limited defense impeachment to the fact of misdemeanor evidence; and trial counsel was ineffective because he failed to offer evidence of the specific conduct underlying the misdemeanor convictions. Id., Ex. 3. On May 25 2012, in a reasoned opinion, the California Court of Appeal affirmed the judgment. Id., Ex. 6. On August 29, 2012 the California Supreme Court summarily denied the petition for review. Id., Ex. 10. Petitioner also filed a petition for a writ of habeas corpus in the California Court of Appeal, raising the issues in the instant habeas petition, namely ineffective assistance of trial counsel and of counsel appointed to file a new trial motion. Id., Ex. 4. The state appellate court summarily denied his habeas petition. Id., Ex. 7. Petitioner then filed a petition for a writ of habeas corpus in the California Supreme Court, which was also denied. Id., Exs. 9 and 11.

The instant petition was filed on June 18, 2013.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal[1]:

> The convictions are all associated with a brief physical altercation the evening before Thanksgiving in 2008, that occurred between occupants and visitors at two residences next to each other on Second Street in Clearlake Oaks, and culminated in the shooting of Patrick O'Connor, Sr., known as Rick. Defendant did not contest that he committed the shooting, but claimed the shot was fired due to accidental discharge of his handgun during a struggle with the victim.
>
> The victim and his wife Maria, Rick's son Patrick O'Connor, Jr., and his wife Angelica and their children, and Rick's brother James O'Connor, occupied one of the houses.[1] The adjacent house was occupied by Jill Robbins, who was visited that evening by her former boyfriend Daniel Clapp, an acquaintance Willard Moleiro and his companion Kim, defendant and his companion Stephanie, and defendant's brother Cecil. Defendant and his brother are African–Americans; the O'Connors are White.
>
> > FN 1: For the sake of clarity and convenience we will refer to the O'Connor's by their first names. For the same reasons we will also refer to defendant and his brother Cecil by their first names.

[1] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

During the course of the evening, the gathering at Robbins's house became boisterous. Moleiro observed defendant waving a "small caliber automatic" gun, while "ghetto trash talking."

When the victim and his son Patrick heard yelling and swearing at Robbins's house, they proceeded to the fence at the corner of their yard to "see what was going on." Defendant was standing on Robbins's front porch talking loudly on his cell phone. Robbins testified that she heard "voices raised" outside, so she walked out her front door and asked defendant to "please lower his voice." Defendant told Robbins to, "shut the hell up," or "bitch shut up," which according to her was typical language from him.

Rick and James heard an offensive verbal exchange between defendant and Robbins on the front porch. They also observed defendant push Robbins, although Robbins testified that defendant never touched her. The "men next door" asked Robbins if she needed help; her response was, "No, absolutely not." Rick told defendant, "That's enough of that." Rick and James testified that defendant retorted, "Fuck you, nigger."

Incensed that defendant called him "a name," Rick rushed through a gate into Robbins's yard, followed by Patrick and James. Robbins testified that as they pushed past her toward the front porch, Rick was holding what appeared to be a stick or pipe, and Patrick had what "looked like a screwdriver." She also heard one of them yell, "Get those fucking niggers." Patrick and Rick testified that they did not have any weapons in their hands, although Rick acknowledged that he carried a "tiny old-timer pocketknife" in his pocket as he approached defendant.

As Rick reached the porch, defendant struck him on the side of his head "with a hard object." Rick pushed defendant, who took "a couple steps back." According to Rick, defendant then stepped forward, raised a gun, and shot him.

Cecil, who had joined defendant on the porch, swung his fist at Patrick, but missed when Patrick ducked. As Patrick pushed Cecil away, he heard the "boom" of a gunshot, looked over, and saw the "flash" of a gun in defendant's right hand. Rick stumbled back and yelled, "I've been shot." Patrick testified that he heard two more two "clicking sounds" as he and Rick started to run away.

James heard the shot as he jumped the fence into Robbins's yard. When he reached the porch James asked Cecil if he shot Rick. Cecil immediately punched him in the jaw, knocking him to the ground. Robbins testified that James called defendant "a nigger," whereupon Cecil said, "You called my brother a nigger," and punched James in the face. James sustained a broken jaw from the punch.

Rick, Patrick and James retreated to their yard and awaited medical help. Rick was transported to the hospital for treatment of a gunshot wound that entered the base of his neck just above the sternum, and exited his back. Both defendant and Cecil ran through the front gate, out of the yard, and onto Second Street. At the hospital later that night a photo lineup was displayed to Rick; he identified defendant as the man who shot him.

A police investigation of the scene of the shooting that night revealed "blood drops" on Robbins's front porch, but no expended shell casings or weapons of any kind. The next day, a Walther PPK .380–caliber semi-automatic pistol was found in the dirt on the side of a carport, three houses away from Robbins's residence. Two rounds were "jammed" in the chamber, and three more were in the magazine. Upon inspection, dirt and a piece of cloth were discovered in the ejection port and the magazine of the gun. The registered owner of the gun was not determined, and it was not identified as the weapon used to shoot the victim.

The prosecution offered expert testimony on the condition and operation of the Walther PPK .380–caliber semi-automatic pistol. Sergeant Donald McPherson of the Lake County Sheriff's Department testified that the gun was equipped with an "internal safety" mechanism that prevented accidental firing without the "trigger being pulled." However, he testified that the gun may accidentally discharge if a person mistakenly left a finger on the trigger while holding it. The Walther PPK .380–caliber semi-automatic pistol was functional, but failed to properly reload and jammed occasionally during test firing.

The defense expert, Kenneth Gaudet, also examined the Walther PPK .380–caliber semi-automatic pistol found near the scene of the shooting. He agreed that the gun was functional, despite its dirty condition and oxidation. When the gun was test fired, Gaudet noticed that it malfunctioned intermittently due to "a failure to feed" from the magazine into the chamber.

Defendant was arrested in Las Vegas in December of 2008. In his ensuing statement to the police defendant asserted that after he exchanged insults and offensive epithets with the O'Connors, he observed them walk into Robbins's yard, "all riled up." Defendant became concerned when he observed one of the O'Connors carrying a "buck knife," so he removed the gun from his coat pocket and struck the victim in the head with it. When defendant hit Rick with the gun, it accidentally "went off." "Bam!" Defendant stated that he did not mean to shoot Rick. He insisted that if he had intended to kill the victim he would have fired multiple shots, not "just one." He then "panicked" and fled down the street. He threw the gun in someone's front yard as he left.

People v. McDaniel, No. A130570, 2012 WL 1898840, at *1–*3 (Cal. Ct. App. May 25, 2012).

## III. DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

United States District Court
Northern District of California

4

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended section 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the

1  precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17

2  (2003).

3          Section 2254(d) applies to both unexplained and reasoned decisions issued by the state

4  court. "When a federal claim has been presented to a state court and the state court has denied

5  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of

6  any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S.

7  Ct. 770, 784–85 (2011) (one-sentence order denying habeas petition analyzed under section

8  2254(d)); Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013) (order that discusses state law claim

9  but not federal claim rebuttably presumed to be rejection on the merits and therefore subject to

10  section 2254(d)).

11  B.    Petitioner's Ineffective Assistance of Counsel Claims

12          Petitioner alleges that he was deprived of effective assistance of counsel because of trial

13  counsel's failure to impeach Rick and James with available evidence that would have undermined

14  their account that Petitioner intentionally shot Rick.  Petitioner also alleges that he was deprived of

15  effective assistance of counsel when counsel appointed to prepare a new trial motion failed to

16  investigate and present the above claim in the trial court.

17          Petitioner's claim that trial counsel was ineffective for failing to impeach Rick and James

18  with the conduct underlying their misdemeanor convictions was presented in both his appellate

19  brief, Docket No.12, Ex. 3 at 36–41,[2] and his state habeas petition, id., Ex. 4 at 25–30.[3]  In the

20  appellate proceedings, the state appellate court denied this claim in a reasoned decision.  See

21  People v. McDaniel, 2012 WL 1898840.  Therefore, in evaluating this claim, the Court examines

22  whether the state court decision was contrary to, or an unreasonable application of, federal law; or

23  resulted in a decision that was based on an unreasonable determination of the facts in light of the

24  evidence presented in the state court proceeding.  28 U.S.C. § 2254.  The remaining claims were

25

26  [2] For ease of reference, when citing to the Petitioner's appellate brief, the Court uses the
    pagination of the appellate brief.

27

28  [3] For ease of reference, when citing to the Petitioner's state habeas petition, the Court uses the
    pagination of the state habeas petition.

United States District Court
Northern District of California

1   presented only in the state habeas petition and adjudicated on the merits by the California Court of

2   Appeal in a summary denial, Docket No. 12, Ex. 7, and the California Supreme Court denied the

3   petition for review, id., Ex. 9. Since the state court's decision was unaccompanied by an

4   explanation, the Court evaluates the remaining claims of ineffective assistance of counsel by

5   determining whether Petitioner has met his burden of showing that there was no reasonable basis

6   for the state court to deny relief. Harrington, 131 S. Ct. at 784.

7          1.      Standard

8          Claims of ineffective assistance of counsel are examined under Strickland v. Washington,

9   466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, the petitioner

10  must establish two factors. First, he must establish that counsel's performance was deficient, i.e.,

11  that it "amounted to incompetence under 'prevailing professional norms,' not whether it deviated

12  from best practices or most common custom." Harrington, 131 S. Ct. at 788 (citing Strickland,

13  466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong

14  presumption' that counsel's representation was within the 'wide range' of reasonable professional

15  assistance." Id. at 787 (quoting Strickland, 466 U.S. at 689). Second, he must establish that he

16  was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that,

17  but for counsel's unprofessional errors, the result of the proceeding would have been different."

18  Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine

19  confidence in the outcome. Id. Where the petitioner is challenging his conviction, the appropriate

20  question is "whether there is a reasonable probability that, absent the errors, the factfinder would

21  have had a reasonable doubt respecting guilt." Id. at 695. "The likelihood of a different result

22  must be substantial, not just conceivable." Harrington, 131 S. Ct. at 792 (citing Strickland, 466

23  U.S. at 693). It is unnecessary for a federal court considering an ineffective assistance of counsel

24  claim on habeas review to address the prejudice prong of the Strickland test if the petitioner cannot

25  establish incompetence under the first prong. Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

26  1998).

27         The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential and when

28  the two apply in tandem, review is doubly so." Harrington, 131 S. Ct. at 788 (internal quotation

United States District Court
Northern District of California

7

marks and citations omitted).  "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Id.  The Strickland prejudice analysis is complete in itself and there is no need for an additional harmless error review under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Avila v. Galaza, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

    2.  Analysis

        a)    Ineffective assistance by trial counsel

Petitioner claims that he received ineffective assistance of counsel when trial counsel failed to impeach Rick and James O'Connor with the following available evidence: Rick's earlier testimony at Cecil's trial that he did not see the gun until he heard the muzzle flash; testimony or evidence of the specific conduct underlying Rick's and James's prior misdemeanor convictions; and Rick and James having motive to lie in order to obtain victim-witness funds for their medical bills.  In his traverse, Petitioner appears to assert an additional claim regarding the failure to admit Rick's 1990 conviction for indecent exposure.  Docket No. 13 at 8.  Since there is no allegation that Petitioner's counsel failed to investigate methods of impeachment, the Court focuses on whether the failure to impeach constituted ineffective assistance of counsel.  See, e.g., Reynosos v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) (citing Tucker v. Ozmint, 350 F.3d 433, 444 (4th Cir. 2003)) (failure to investigate possible methods of impeaching a prosecution witness may constitute ineffective assistance of counsel).

        (1)    Rick's testimony at Cecil's trial about the shooting

Petitioner argues that trial counsel was ineffective for failing to impeach Rick with his prior testimony at Cecil's trial regarding the shooting.  According to Petitioner, Rick testified at Cecil's trial that he did not see the gun until after he was shot and then "improved" on his testimony at Petitioner's trial by claiming to have seen Petitioner draw the gun, raise his arm, and point the gun at him before firing it.  Petitioner argues that impeaching Rick with his prior testimony would have undermined Rick's credibility and supported the defense theory of the case that the gun discharged accidentally when Petitioner hit Rick with the gun.

Rick testified under oath at Cecil's trial as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Q:      . . . So you were at the bottom of this step up?

A:      Yes.

Q:      Where was the [defendant]?

A:      Standing on top of the step.

Q:      Was he above you somewhat then?  Was he standing above you?

A:      Yes.

Q:      What happened after you got hit?

A:      I pushed it.

Q:      And what happened after that?

A:      He just went back in one step, and he took one step forward and shot me.

Q:      How did you know it was him who shot you?

A:      What do you mean, that was the only person I seen.

Q:      Did you see a gun?

A:      Not at that particular time, not until I seen the red flash when the trigger got pulled, that's the only time I seen the gun.

Q:      How much of the gun could you see, though, when you saw the flash.

A:      Just the barrel, that's all I seen.

. . . . .

Q:      Do you remember when you first saw the gun come out?

A:      When I first seen it, I was seeing a flash.

Docket No. 12, Ex. #4, Ex. 2.

At Petitioner's trial, Rick testified as follows:

Q:      Okay.  So you say that you approached the defendant.  What happened next?

A:      When I approached him, like I said, I was hit in the side of the head with a hard object.  I pushed him.  He stepped forward and pulled the trigger.

Q:      How close were you to him when you approached him, would you say?

A:      Well, first we were face to face.  I pushed him.  And then he stepped forward and shot me.

Q:      At the time that he – well, when you first approached him, before any of this occurred, how close were you?

A:      2 foot apart.

. . . .

Q:      Did you see a gun in his hand before he shot you?

9

| | |
|---|---|
| A: | No. |
| Q: | Did you see him raise his hand? |
| A: | Yes, as he – yes. |
| Q: | Would you describe to jury what you saw him do – |
| A: | I just seen him – |
| Q: | – with his hand. |
| A: | I seen him raise his hand and shot me. |
| Q: | Can you show the jury what it looked like to you? |
| A: | How it was done? |
| Q: | Yeah. |
| A: | Like that.  At a downward – at a downward projection. |
| Q: | So for the record, you put your hand up and you turned your wrist to the side; is that correct? |
| A: | Yes. |
| Q: | Is that exactly how you saw him do it? |
| A: | Yes. |

. . . .

| | |
|---|---|
| Q: | So he shot you.  At any point did you see a firearm? |
| A: | I just seen the red flash coming out of the barrel. |
| Q: | So you saw – did you see a barrel? |
| A: | I just seen a red flash. |

Docket No. 12, Ex. 2 ("RT") at 366–70.

Petitioner has failed to meet his burden of showing that there was no reasonable basis for the state court to deny relief.  When read in context, Rick's statement "I seen [Petitioner] raise his hand and shot me" (RT at 369) is consistent with his testimony at Cecil's trial.  At Petitioner's trial, Rick described the following sequence of events: Rick approached Petitioner; Rick was hit in the side of the head with a hard object, which Rick presumed was Petitioner hitting him with the gun; Rick pushed Petitioner; and Petitioner stepped forward and shot Rick.  Id. at 366.  Rick's statement is in response to the prosecutor's question, "Would you describe to the jury what you saw him do . . . with his hand?"  Rick's testimony can reasonably be understood as two separate statements: that he saw Petitioner raise his hand and that Petitioner shot him.  Petitioner mischaracterizes Rick's testimony.  Rick does not claim to have seen Petitioner draw the gun or

10

1   point the gun.

2       In addition, Rick stated twice that he did not see the gun before he was shot, consistent

3   with his testimony at Cecil's trial.  RT at 369 and 370.  At Cecil's trial, Rick testified as follows

4   about whether he saw the gun:

5       Q:    Did you see a gun?

6       A:    Not at that particular time, not until I seen the red flash when the trigger got pulled,
              that's the only time I seen the gun.
7
        Q:    How much of the gun could you see, though, when you saw the flash.
8
        A:    Just the barrel, that's all I seen.
9
        . . . . .
10
        Q:    Do you remember when you first saw the gun come out?
11
        A:    When I first seen it, I was seeing a flash.

12  Docket No. 12, Ex. 4, Ex. 2.

13      Rick's responses to similar questioning at Petitioner's trial were consistent:

14
        Q:    Did you see a gun in his hand before he shot you?
15
        A:    No.
16
        . . . .
17      Q:    So he shot you.  At any point did you see a firearm?

18      A:    I just seen the red flash coming out of the barrel.

19      Q:    So you saw – did you see a barrel?

20      A:    I just seen a red flash.

21  RT at 369, 370.  Given the similarity and overall consistency of Rick's testimony, trial counsel's

22  failure to impeach Rick with his prior testimony at Cecil's trial did not constitute ineffective

23  assistance of counsel as defined by Strickland.

24      Nor does the record support a finding that there was a reasonable probability that Petitioner

25  would have received a different verdict if trial counsel had impeached Rick with his prior

26  testimony.  It is unclear that Rick's credibility would have been undermined by the presentation of

27  his prior testimony since the prior testimony was generally consistent with his trial testimony.  In

28  addition, evidence was presented that it was highly unlikely that the gun would have accidentally

United States District Court
Northern District of California

11

1    discharged.  RT at 61, 62.  A reasonable argument can be made that counsel satisfied <u>Strickland</u>'s

2    deferential standard.  <u>See</u>, <u>e.g.</u>, <u>Harrington</u>, 131 S. Ct. at 788.  This claim is denied.

3                    (2)      Rick's and James's prior misdemeanor convictions

4            Petitioner argues that trial counsel's failure to cross-examine Rick and James regarding the

5    conduct underlying their misdemeanor convictions constituted ineffective assistance.  Petitioner

6    further argues that trial counsel was ineffective because he misunderstood the law regarding

7    whether witnesses could be impeached with conduct underlying their misdemeanor convictions,

8    and because he failed to object and insist on the admission of the underlying conduct.

9            Trial counsel sought to admit evidence of prior crimes committed by Rick to show

10   evidence of Rick's propensity towards violence, RT at 335, and for impeachment purposes, <u>id.</u> at

11   337–38.  On cross-examination, Rick admitted to the following convictions: a 2004 conviction for

12   violation of court order (Cal. Penal Code § 273.6); a 2005 conviction for misdemeanor battery

13   (Cal. Penal Code § 242); and a 2009 conviction for assault against a domestic partner (Cal. Penal

14   Code § 243(E)(1)).  <u>Id.</u> at 387.  On redirect, Rick testified that each of the prior convictions had

15   been misdemeanors and that the assault upon a domestic partner had occurred after he had been

16   shot by Petitioner.  <u>Id.</u> at 388.  Petitioner argues that "Rick's past conduct involving displaying his

17   bare posterior at others as well as contacting his ex-wife in violation of a court protective order

18   would have impeached the credibility of his account of the shooting, because the conduct

19   demonstrates a base moral character that resorts to aggressive confrontation contrary to [Rick's]

20   testimony."  Doc. #1-1 at 32.

21           Trial counsel sought to admit evidence of prior crimes of moral turpitude committed by

22   James for impeachment purposes.  On cross-examination, James admitted to the following

23   convictions: a 2001 conviction for burglary (Cal. Penal Code § 459) and a 2002 conviction for

24   possession of stolen property (Cal. Penal Code § 496(A)).  RT at 314.  On redirect, James testified

25   that these convictions were for misdemeanors committed seven or eight years earlier.  <u>Id.</u> at 315.

26   Petitioner argues that "[e]vidence of James's past conduct involving possession of stolen property

27   and entering a structure with intent to steal or commit another felony demonstrates dishonesty and

28   readiness to do evil to others."  Doc. #1-1 at 31–32.

United States District Court
Northern District of California

Petitioner raised a version of this claim in his post-trial <u>Marsden</u> motion.  Petitioner argued that trial counsel had been ineffective in 24 different ways, including failing to investigate Rick's domestic violence conviction.  RT at 1374.  At the <u>Marsden</u> hearing, trial counsel testified that he felt that he had adequately brought out Rick's criminal history, <u>id.</u> at 1400, and that he had not attempted to bring out the underlying conduct because he was satisfied with the jury instruction on the issue,[4] <u>id.</u> at 1417–18.

Petitioner raised this argument in full in his appellate brief and his state habeas petition. The state appellate court denied this claim in a reasoned decision in the appellate proceeding:

II. The Failure of the Trial Court to Admit Evidence of the Acts Associated with the Prior Misdemeanor Convictions.

We move to defendant's claim that the trial court erred by limiting the impeachment evidence to the "fact" of the prior misdemeanor convictions, rather than admitting evidence of the "specific conduct perpetrated by the witness."  The court ruled that defense counsel could question James "about the nature" of the two convictions, the dates, the code sections violated and "the description."  As for Rick's prior convictions, the court obtained a stipulation that he suffered a misdemeanor conviction for battery in violation of section 242 in Lake County in 2005.  Impeachment evidence of Rick's other two prior convictions — for violation of a domestic restraining order and assault on a domestic partner — was admitted without discussion or explanation of the nature of the evidence or inquiry permitted.  During Rick's testimony he admitted a 2004 misdemeanor conviction of violation of a court order and a 2009 conviction for assault of a domestic partner.

Defendant complains that he was "entitled to introduce evidence of Rick's and James's conduct that resulted in their misdemeanor convictions."  He points out that the critical issue in the case revolved around the jury's consideration of the defense theory — predicated in great measure on defendant's statements to the police — that the shooting was in self-defense and the result of an accidental discharge of the gun balanced against the testimony of Rick, James, and Patrick that described both the provocation preceding the shooting and the nature of the shooting itself.  The prosecution presented "no evidence that corroborated Rick's and James's testimony about the provocation or the shooting."  Thus, defendant asserts that the credibility of Rick and James "was of crucial importance to the prosecutor's case."  He claims that "the exclusion of specific facts of prior

_____

[4] The jury was instructed, pursuant to CALCRIM No. 316, "If you find that a witness has committed a crime or other misconduct, you may consider that fact in evaluating the credibility of the witness's testimony.  The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."  RT at 1271 and CT at 912.

dishonest conduct by Rick and James left the jury with an imbalanced view of their credibility," and "gave the prosecution an unfair advantage" in the assessment of their credibility.

In accordance with <u>Wheeler</u>, <u>supra</u>, 4 Cal.4th 284, 293–295, specific prior acts of misdemeanor conduct bearing on a witness's veracity may be used as impeachment evidence.  (See also <u>People v. Chavez</u>, <u>supra</u>, 84 Cal.App.4th 25, 28.) The fact of misdemeanor conviction alone, however, is not relevant to a witness's credibility; instead, "a witness's prior convictions are relevant for impeachment, if at all, only insofar as they prove criminal conduct from which the factfinder could infer a character inconsistent with honesty and veracity."  (<u>Wheeler</u>, <u>supra</u>, at p. 299; <u>see also</u> <u>People v. Lopez</u>, <u>supra</u>, 129 Cal.App.4th 1508, 1522.)[2]

> FN 2: The court in <u>Wheeler</u> rejected the argument that misdemeanor convictions are admissible under the business or official records exceptions to the hearsay rule (Evid. Code, §§ 1271, 1280), because such a record is "competent only to prove the act it records," not "that the witness committed the underlying criminal conduct."  (<u>Wheeler</u>, <u>supra</u>, 4 Cal.4th 284, 300, fn. 13; <u>see also</u> <u>People v. Duran</u> (2002) 97 Cal.App.4th 1448, 1459–1460.)  The court also noted that the Legislature was not precluded from creating a hearsay exception that would allow the use of misdemeanor convictions for impeachment in criminal trials.  (<u>Wheeler</u>, <u>supra</u>, at p. 300, fn. 14.)  The Legislature responded.  Evidence Code section 452.5, subdivision (b), enacted in 1996, now provides: "An official record of conviction certified in accordance with subdivision (a) of Section 1530 is admissible pursuant to Section 1280 to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." This section "creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred."  (<u>People v. Duran</u>, <u>supra</u>, at p. 1460; <u>see also</u> <u>People v. Wesson</u> (2006) 138 Cal.App.4th 959, 967–968.)

A. The Lack of an Objection by Defendant

As both defendant and the Attorney General point out, the defense made no objection at trial to the limited admission of the impeachment evidence.  In fact, defense counsel neither specifically sought admission of evidence of the conduct underlying the prior convictions nor challenged the court's admission of only the fact of the misdemeanor convictions to impeach the witnesses.  The lack of a timely objection or specific request to admit misconduct evidence by defendant both compromises his right to consideration of the issue on appeal and impacts our review of the trial court's evidentiary ruling.

A challenge to the admission of evidence must be made at trial or is considered forfeited on appeal.  (See <u>People v. Jablonski</u> (2006) 37 Cal.4th 774, 823; <u>People v. Fauber</u> (1992) 2 Cal.4th 792, 831.)  "Under Evidence Code section 353, subdivision (a), a judgment can be reversed because of an erroneous admission of evidence only if the record contains an objection both '"timely made and so stated

as to make clear the specific ground of the objection'" or motion.  [Citation.]  If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal."  (People v. Polk (2010) 190 Cal.App.4th 1183, 1194; see also People v. Lewis (2008) 43 Cal.4th 415, 503.)  "'While no particular form of objection is required [citation], the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.]"  (People v. Holt (1997) 15 Cal.4th 619, 666–667; see also People v. Doolin (2009) 45 Cal.4th 390, 438.)  Here, defense counsel's presentation of impeachment evidence and failure to object to the ultimate limitation on the admission of the evidence to the prior misdemeanor convictions themselves did not alert the trial court to the basis of the challenge in this appeal.

Recognizing the impediment of forfeiture, defendant asserts that his counsel's failure to object and urge the admission of the conduct evidence constituted ineffective assistance of counsel.  The principles that govern defendant's claim of "constitutionally inadequate representation are settled."  (In re Lucas (2004) 33 Cal.4th 682, 721.)  "To establish a claim of inadequate assistance, a defendant must show counsel's representation was 'deficient' in that it 'fell below an objective standard of reasonableness ... under prevailing professional norms.' [Citations.]  In addition, a defendant is required to show he or she was prejudiced by counsel's deficient representation. [Citations.]  In determining prejudice, we inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result would have been more favorable to the defendant."  (People v. Frye, supra, 18 Cal.4th 894, 979, citing Strickland v. Washington (1984) 466 U.S. 668, 687–688.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (People v. Williams (1997) 16 Cal.4th 153, 215; see also In re Jones (1996) 13 Cal.4th 552, 561.)

Further, a judgment will be reversed "on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' [Citations.]"  (People v. Frye, supra, 18 Cal.4th 894, 980.)  "To prevail, defendant must overcome the strong presumption that counsel's actions were sound trial strategy under the circumstances prevailing at trial."  (People v. Freeman (1994) 8 Cal.4th 450, 498.)  The "'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' [Citation.]"  (People v. Brodit (1998) 61 Cal.App.4th 1312, 1335–1336.)  "Where the record contains no explanation for the challenged representation, we will reject an ineffective assistance claim unless counsel was asked to explain his performance and failed to provide an explanation, or unless there simply could be no satisfactory explanation."  (People v. King (2010) 183 Cal.App.4th 1281, 1299; see also People v. Mitcham (1992) 1 Cal.4th 1027, 1058; People v. Rios (1992) 9 Cal.App.4th 692, 704.)  "'To sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call him.'"  (In re Noday (1981) 125 Cal.App.3d 507, 522, quoting People v. Hill (1969) 70 Cal.2d 678, 690–691.)

United States District Court
Northern District of California

"'Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, not on appeal.' [Citation.]"  (People v. Lucero (2000) 23 Cal.4th 692, 728–729.)

We proceed to examine the propriety of the admission of the misdemeanor conduct evidence both to address the issue on the merits and to resolve defendant's associated claim of ineffective assistance of counsel.  (People v. Valli (2010) 187 Cal.App.4th 786, 802; People v. Reyes (2008) 165 Cal.App.4th 426, 433–434.)

B. The Admissibility of Misdemeanor Conduct Evidence

Evidence of the past misdemeanor conduct of Rick and James evincing moral turpitude was admissible for impeachment, subject to the trial court's discretion to exclude the evidence under Evidence Code section 352.  (Wheeler, supra, 4 Cal.4th 284, 295; People v. Duran, supra, 97 Cal.App.4th 1448, 1459–1460.)  With a specific request or objection by the defense, the trial court would have at least been required to entertain discretion to admit the conduct evidence. (Clark, supra, 52 Cal.4th 856, 932–933; People v. Cadogan (2009) 173 Cal.App.4th 1502, 1514–1515.)

Without a request by defendant to admit the underlying conduct evidence or an offer of proof of its content, we do not know what the underlying conduct was, whether or what extent it would have been probative on the witnesses' veracity, the degree of prejudice associated with the witnesses' misdemeanor conduct, how defendant would have attempted to prove it, or whether he even could have ultimately done so.  (See People v. Chatman (2006) 38 Cal.4th 344, 373.)  We are also presented with the difficulty of assessing the correctness of a ruling the trial court was never asked to make.  (Ibid.)

Even if we proceed on the assumption that the misdemeanor conduct evidence was admissible, however, we do not find that prejudicial error or ineffective assistance of counsel occurred.  First, the trial court, having admitted the evidence of the convictions themselves, may have justifiably determined that the additional conduct evidence would have entailed undue prejudice and consumption of time, without probative value to the impeachment effort of the defense.  On the record before us, no basis has been presented to conclude that excluding the conduct evidence would have been an abuse of the court's broad discretion.  (See People v. Chatman, supra, 38 Cal.4th 344, 374.)

More importantly, no prejudice to the defense resulted from the omission of the misdemeanor conduct evidence.  The misdemeanor convictions themselves effectively accomplished the impeachment of the witnesses sought by the defense. The additional impeachment value of the conduct evidence was negligible in relation to the misdemeanor convictions already admitted.  Although we agree with defendant that the jury's evaluation of the credibility of Rick and James was a critical factor at trial, we are convinced the jury would not have received a significantly different impression of their veracity even if the conduct evidence had been admitted.  (People v. Whisenhunt, supra, 44 Cal.4th 174, 207–208.)  And as

16

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

we have noted, the defense otherwise thoroughly engaged in impeachment of the witnesses at trial.  Finally, the evidence of defendant's commission of attempted voluntary manslaughter was quite strong, whereas the theories of self-defense and accidental shooting offered by the defendant were correspondingly weak.  We conclude that counsel's failure to obtain admission of the misdemeanor conduct evidence to impeach the witnesses was harmless under the reasonable probability test of People v. Watson (1956) 46 Cal.2d 818, 836, or under the beyond a reasonable doubt test of Chapman v. California (1967) 386 U.S. 18, 23–24. (People v. Hartsch (2010) 49 Cal.4th 472, 497–498; People v. Guerra (2006) 37 Cal.4th 1067, 1144–1145;  People v. Robinson (2005) 37 Cal.4th 592, 628; People v. Feaster (2002) 102 Cal.App.4th 1084, 1094.)³  It follows that defense counsel's failure to seek admission of the impeachment evidence was not prejudicial. (People v. Myers (2007) 148 Cal.App.4th 546, 554.)⁴

> FN 3: We observe that "the Strickland 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights." (People v. Mesa (2006) 144 Cal.App.4th 1000, 1008–1009.)

> FN 4: Defendant has presented several additional claims of incompetence of counsel in a related petition for writ of habeas corpus, A133603, which we have reviewed.  We deny the petition by separate order filed this date.

People v. McDaniel, 2012 WL 1898840, at *6–*8.

Petitioner has failed to show that that the state court decision was contrary to, or involved an unreasonable application of, federal law.  Petitioner has not shown that trial counsel's representation fell below an objective standard of reasonableness.  See Strickland, 466 U.S. at 688. Trial counsel called into doubt Rick's and James's credibility in various ways.  Through cross-examination, trial counsel established that Rick and James had misdemeanor convictions and the jury instruction specified misdemeanor convictions could be used to judge their credibility.  RT at 314 and 387.  Trial counsel also established that Rick and James had been drinking earlier that day and that both men had instigated and/or escalated the confrontation.  Id. at 290, 396 and 446.  Trial also elicited testimony from witnesses that Rick was possibly racist.  Id. at 400.  There is a "'strong presumption' that [trial] counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Harrington, 131 S. Ct. at 790; see also Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) ("But Strickland specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise

17

1   of reasonable professional judgment'") (alteration in original).

2          In addition, the state appellate court's conclusion that Petitioner was not prejudiced by the

3   failure to admit additional impeachment evidence was not an unreasonable determination of the

4   facts in light of the evidence presented in the trial court proceeding.  There was significant

5   evidence of Petitioner's guilt outside of Rick's and James's testimony.  Petitioner confessed to

6   shooting Rick; a gun matching the description given by various witnesses was found in a yard

7   adjacent to the path which witnesses stated Petitioner took as he fled the scene of the shooting; an

8   expert witness testified that guns are unlikely to fire accidentally; Petitioner pistol-whipped Rick

9   seconds after Rick arrived at Jill's house implying Petitioner had a violent nature; and besides Jill,

10  no one else confirmed Petitioner's account that Rick and James had weapons in their hands.  This

11  claim is denied.

            (3)      Request made by Rick and James for compensation from the victim-
12                   witness fund

13         Petitioner argues that trial counsel should have impeached Rick and James with whether

14  they sought compensation from the restitution fund run by the California Victim Compensation

15  and Government Claims Board.  Pursuant to section 13950 of California Government Code, crime

16  victims may seek compensation "for the pecuniary losses they suffer as a direct result of criminal

17  acts."  Cal. Gov't Code § 13950(a).  Compensation will be denied if the victim "knowingly and

18  willingly participated in the commission of the crime that resulted in the . . . loss" or if the victim

19  fails to "cooperate reasonably with a law enforcement agency in the apprehension and conviction

20  of a criminal committing the crime."  Cal. Gov't Code § 13956(a) and (b).  Petitioner argues that

21  applying for victim-witness funds motivated Rick and James to lie and fashion their testimony in a

22  manner that would ensure Petitioner's conviction and that minimized their responsibility for

23  instigating the fight that led to the shooting.  Petitioner argues that trial counsel had no tactical

24  reason to not impeach Rick and James with the evidence that they had sought victim-witness

25  funds.

26         Petitioner raised this argument in his post-trial Marsden hearing, and the trial court

27  questioned trial counsel, Mr. Conwell, as follows:

28

United States District Court
Northern District of California

18

United States District Court
Northern District of California

| The Court: | . . . Mr. McDaniel claims that the O'Connors lied on the stand for Victim of Violent Crime money.  That you should have cross-examined them about Victim of Violent Crimes money because that would be a motive for them to lie. |

Mr. Conwell:  I – I just didn't think that was credible.

The Court:    Didn't think what was credible.

Mr. Conwell:  I didn't think a cross-examination going into him making up statements regarding medical costs of a gunshot wound to the chest would be a valuable area of cross-examination.

The Court:    Well, first of all, the Victims of Crime – Violent Crime money you feel were used for medical expenses?

Mr. Conwell:  That would be my guess.  And I didn't get into discovery regarding how much he received or the money he received.  But in order to go into that I would imagine that one of the areas of victim restitution is for the damage costs.  And here I would imagine that you have a great deal of medical costs regarding the gunshot wound, which would lend heavy emphasis to the gunshot wound.  I didn't think that would help.

RT at 1418.  Trial counsel had a strategic consideration for declining to cross-examine Rick and James regarding the victim-witness funds.  His decision appears reasonable under the circumstances.  Dr. Gerald McCallum had already testified for the prosecution about Rick's gunshot wound, emphasizing how the trajectory of the bullet was near vital organs, that Rick had trouble breathing and required a chest intubation, and that the gunshot was nearly fatal.  Id. at 270, 272–73.  Additional testimony about the gunshot wound could have further emphasized Rick's victim status and the violent nature of the shooting which would have run counter to the defense's attempt to emphasize Rick's combative nature.  In addition, trial counsel employed other methods of attacking the credibility of Rick's and James's version of the shooting.  Trial counsel elicited testimony from witnesses that Rick and James had consumed alcohol consumption that day, id. at 384, 396, 1002; that Rick and James instigated the confrontation that resulted in the shooting and ran onto Jill's property, id. at 387, 432–33, 447, 982, 985–86, 1004–05, 1015; that Jill tried to stop Rick and James from coming onto her property, id. at 428, 429; that Rick and James chose to personally confront Petitioner rather than call the police, id. at 394; and that Rick and James rushed at Petitioner, id. at 432–33.  Given these circumstances, trial counsel's tactical decision to

1    not cross-examine Rick and James regarding victim-witness funds deserves deference.  Tactical

2    decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on

3    strategic considerations; (2) counsel makes an informed decision based upon investigation; and

4    (3) the decision appears reasonable under the circumstances.  See Sanders v. Ratelle, 21 F.3d

5    1446, 1456 (9th Cir. 1994).  A difference of opinion as to trial tactics does not constitute denial of

6    effective assistance.  See United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981).  This claim is

7    denied.

8                      (4)       Rick's 1990 conviction for indecent exposure

9        In his traverse, Petitioner argues an additional claim that was not raised in the instant

10   petition.  Petitioner argues that the trial court erred and counsel was ineffective when Rick's 1990

11   conviction for indecent exposure was not admitted.  Docket No. 13 at 8, 17–19.

12       To the extent that Petitioner claims that counsel was ineffective for failing to seek

13   admission of this prior conviction, this claim is denied as unexhausted.  Prisoners in state custody

14   who wish to challenge collaterally in federal habeas proceedings either the fact or length of their

15   confinement are first required to exhaust state judicial remedies, either on direct appeal or through

16   collateral proceedings, by presenting the highest state court available with a fair opportunity to

17   rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. §

18   2254(b), (c); Rose v. Lundy, 455 U.S. 509, 515–16 (1982).  Petitioner did not raise this claim in

19   either his appellate brief or his habeas petition.  It is not sufficient to raise the facts supporting this

20   claim; rather, "the constitutional claim . . . inherent in those facts" must be brought to the attention

21   of the state court.  See Picard v. Connor, 404 U.S. 270, 277 (1971).  Moreover, the record

22   indicates that trial counsel did seek admission of the indecent exposure conviction.  RT at 339–42,

23   348–49, and 351–52.

24       To the extent that Petitioner is arguing that the trial court erred in refusing to admit the

25   indecent exposure conviction, the state appellate court denied the claim as follows:

26           Defendant argues that the trial court erred by limiting defense impeachment

27       evidence. Evidence of misdemeanor convictions suffered by James and Rick was
          offered by the defense to impeach the witnesses: James's conviction of burglary in

28       2001 and possession of stolen property in 2002; and Rick's convictions of indecent

United States District Court
Northern District of California

20

exposure in 1990, violation of a domestic restraining order in 2004, battery in 2005, disturbing the peace in 2008, and assault on a domestic partner in 2009.  The court granted the defense request to impeach James with the fact and nature of both of his prior misdemeanor convictions, but not the conduct associated with them.  The court excluded the proffered evidence of Rick's misdemeanor convictions for indecent exposure and disturbing the peace, but admitted the fact of his remaining convictions as impeachment evidence.

Defendant presents two contentions related to the exclusion of evidence offered to impeach James and Rick.  First, he complains that the court "abused its discretion in excluding the indecent exposure incident."  Second, he argues that the court erred by admitting "the mere fact of prior convictions for misdemeanors," and excluding "evidence of the specific conduct" by Rick and James that resulted in the convictions.  Defendant maintains that the court's limitation on defense impeachment evidence deprived him of the opportunity to "show the jury that these witness were likely dishonest and morally lax," in violation of his "right to confrontation, cross-examination and due process."  He submits that the limitation placed on the ability of the defense to "properly confront and cross-examine these two key witnesses prejudiced his right to a fair trial," and requires reversal.

We begin our inquiry with recognition of the fundamental constitutional premise that, "'[T]he right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.  Indeed, ... to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.' [Citation.]"  (<u>People v. Brown</u> (2003) 31 Cal.4th 518, 538.)  Further, a defendant in a criminal case must have an opportunity to present a complete defense to the charges against him. (<u>People v. Adams</u> (2004) 115 Cal.App.4th 243, 253–254;  <u>People v. Sixto</u> (1993) 17 Cal.App.4th 374, 398–399.)  "'Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.]  [But i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' [Citation.]"  (<u>People v. Ayala</u> (2000) 23 Cal.4th 225, 269.)  The rights to confront witnesses and to present exculpatory evidence are not absolute and have limitations.  (<u>Taylor v. Illinois</u> (1988) 484 U.S. 400, 410; <u>People v. Brown</u>, <u>supra</u>, at p. 538; <u>People v. Jackson</u> (1993) 15 Cal.App.4th 1197, 1203.)

The right of cross-examination "includes exploration of bias."  (<u>People v. Greenberger</u> (1997) 58 Cal.App.4th 298, 349; <u>see also</u> <u>People v. Box</u> (2000) 23 Cal.4th 1153, 1203.)  "'Evidence showing a witness's bias or prejudice or which goes to his credibility, veracity or motive may be elicited during cross-examination.' [Citation.]"  (<u>People v. Carpenter</u> (1999) 21 Cal.4th 1016, 1054.)  "'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."' [Citations.]"  (<u>People v. Frye</u> (1998) 18 Cal.4th 894, 946.)  Confrontation clause questions arise where

United States District Court
Northern District of California

restrictions imposed by the trial court effectively "'emasculate the right of cross-examination itself.'" (Delaware v. Fensterer (1985) 474 U.S. 15, 19, quoting Smith v. Illinois (1968) 390 U.S. 129, 131.) "'It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop.'" (Alvarado v. Superior Court (2000) 23 Cal.4th 1121, 1139, citing Alford v. United States (1931) 282 U.S. 687, 691–693.)

The "right of confrontation is not absolute, however [citations], 'and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' [Citation.]" (Alvarado v. Superior Court, supra, 23 Cal.4th 1121, 1138–1139; see also People v. Stritzinger (1983) 34 Cal.3d 505, 515; People v. Harris (1985) 165 Cal.App.3d 1246, 1257.) "'[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. ' [Citations.]  Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation." (People v. Greenberger, supra, 58 Cal.App.4th 298, 350; see also Delaware v. Van Arsdall (1986) 475 U.S. 673, 679;  People v. Cooper (1991) 53 Cal.3d 771, 817; People v. Harris (1989) 47 Cal.3d 1047, 1091.)  Ordinarily, proper application of the statutory rules of evidence does not impermissibly infringe upon a defendant's due process rights.  (See People v. Lucas (1995) 12 Cal.4th 415, 464; People v. Fudge (1994) 7 Cal.4th 1075, 1102–1103; People v. Hawthorne (1992) 4 Cal.4th 43, 58.) "In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (People v. Quartermain (1997) 16 Cal.4th 600, 623.)

"The confrontation clause 'guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citations.]" (People v. Clair (1992) 2 Cal.4th 629, 656, fn. 3; see also People v. Cooper, supra, 53 Cal.3d 771, 817.) "'Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (People v. Hillhouse (2002) 27 Cal.4th 469, 494; see also People v. Brown, supra, 31 Cal.4th 518, 545–546.)

I. The Exclusion of the Indecent Exposure Conviction.

The trial court excluded the impeachment evidence of Rick's indecent exposure conviction offered by the defense on grounds that it was more prejudicial than probative.  The court particularly focused on the remoteness of the 1990 conviction, the potential for prejudicial impact on the jury, and the lack of probative value to challenge the witness's credibility.  Defendant argues that the exclusion of the prior conviction to impeach Rick was an abuse of the court's discretion.

In People v. Wheeler (1992) 4 Cal.4th 284, 295–297 (Wheeler), the California Supreme Court "determined that a person can be impeached in a criminal case by evidence of prior misdemeanor conduct that involves moral turpitude." (People v. Lopez (2005) 129 Cal.App.4th 1508, 1522.) "Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach" a witness. (People v. Harris (2005) 37 Cal.4th 310, 337.) "'[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.]" (People v. Clark (2011) 52 Cal.4th 856, 931 (Clark).)

Evidence of an indecent exposure conviction has the requisite moral turpitude to qualify for admission to impeach the testimony of a witness. The "requirement of lewdness, which is needed for a conviction of indecent exposure in California, supplies the assurance that a conviction for indecent exposure is one which necessarily involves moral turpitude." (People v. Ballard (1993) 13 Cal.App.4th 687, 696.)

Nevertheless, a "trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352." (People v. Whisenhunt (2008) 44 Cal.4th 174, 207.) "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify." (Clark, supra, 52 Cal.4th 856, 931.)

Review of a trial court's exclusion of impeachment evidence "pursuant to Evidence Code section 352 is subject to abuse of discretion analysis. [Citations.] 'The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon mechanically automatic rules.... [Citation.]" (People v. Greenberger, supra, 58 Cal.App.4th 298, 352.) "The determination whether a defendant has been denied the right of confrontation is focused on the individual witness. The standard for determining if a confrontation clause violation has occurred is whether a reasonable jury might have received a significantly different impression of the witness's credibility had the defendant been permitted to pursue his proposed line of cross-examination." (Id. at p. 350.) We find error only if the trial court's decision exceeded the bounds of reason. (People v. Funes (1994) 23 Cal.App.4th 1506, 1519.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (Clark, supra, 52 Cal.4th 856, 932.)

While commission of an indecent exposure offense may evince some moral turpitude, in the present case the probative value of the proffered evidence to impeach the witness was minimal. First, the California Supreme Court "has recognized that evidence of misconduct not amounting to a felony is less probative

23

1    of immoral character than is a prior felony conviction."  (Clark, supra, 52 Cal.4th
2    856, 933.)  In addition, the nature of the particular indecent exposure offense
     committed by Rick was far from egregious or indicative of dishonesty or a
3    "'general readiness to do evil'" from which a readiness to lie may be inferred.
     (People v. Castro (1985) 38 Cal.3d 301, 314;  People v. Rivera (2003) 107
4    Cal.App.4th 1374, 1379–1380; People v. Chavez (2000) 84 Cal.App.4th 25, 28.)
     When queried by the trial court, Rick disclosed that the offense consisted of
5    "moon[ing] someone."  The prior conviction was also quite remote, having
     occurred nearly 20 years before trial, thus having even less probative value to prove
6    the witness's present credibility.

7            Defense counsel was permitted to attack Rick's credibility with other prior
8    convictions for violation of a domestic restraining order, battery, and assault on a
     domestic partner, offenses that were both much more recent and more indicative of
9    his dishonesty and willingness to lie.  Further, during cross-examination the
     defense was otherwise afforded the opportunity to thoroughly explore other factors
10   that adversely affected Rick's credibility: inconsistencies between his testimony at
     trial and prior statements; the discrepancies between his description of the incident
11   and those of other witnesses; his provocative behavior during the incident; and his
     ingestion of alcohol.  Even without the indecent exposure evidence, the witness
12   was not in the least left with a false aura of veracity.  (People v. Hill (1995) 34
13   Cal.App.4th 727, 739.)  We are persuaded that the jury would not have received a
     significantly different impression of Rick's credibility even if the excluded
14   evidence had been admitted.  (People v. Whisenhunt, supra, 44 Cal.4th 174, 208.)
     And finally, evidence of the indecent exposure evidence would have evoked
15   emotional bias against the witness and entailed undue consumption of time on a
     collateral matter that offered inconsequential probative value to the defense. We
16   conclude that the trial court did not abuse its discretion by excluding the evidence
17   of the prior indecent exposure conviction.

18   People v. McDaniel, 2012 WL 1898840, at *4–*6.

19           A review of the record indicates that Rick appeared at trial and was subjected to a thorough

20   cross-examination, which attacked his credibility and his version of the confrontation and

21   shooting.  Even if the indecent exposure conviction was relevant, there were other legitimate

22   interests outweighing Petitioner's interest in presenting the evidence.  In addition, the evidence

23   that was presented provided the jury with sufficient information to assess the credibility of the

24   witness.  See United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (to determine whether

25   a criminal defendant's Sixth Amendment right of confrontation has been violated by the exclusion

26   of evidence on cross-examination, a court must inquire whether: "(1) the excluded evidence was

27   relevant; (2) there were other legitimate interests outweighing the defendant's interests in

28

United States District Court
Northern District of California

24

presenting the evidence; and (3) the exclusion of evidence left the jury with sufficient information to assess the credibility of the witness"). "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, (1985). Accordingly, the Court concludes that the state court's decision rejecting this claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of, the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1), (2). Petitioner is not entitled to habeas relief on this claim.

          b)      Ineffective assistance by counsel appointed to prepare a new trial motion

Petitioner claims that he received ineffective assistance of counsel when counsel appointed to prepare a new trial motion, Komnith Moth, failed to investigate, research, and present the above claims of ineffective assistance to the trial court. Petitioner argues that Mr. Moth's failure to present the above claims in the motion for a new trial prejudiced him by denying him an evidentiary hearing regarding these claims.

Petitioner has failed to meet his burden of showing that there was no reasonable basis for the state court to deny relief. The record shows that Mr. Moth's choices were reasonable and satisfied Strickland's deferential standard. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Mr. Moth reviewed all the discovery in the case to prepare the new trial motion. RT at 1496. He also sought and obtained a continuance to investigate additional grounds raised by Petitioner at the initial hearing on the new trial motion. Id. at 1495. In the new trial motion, Mr. Moth included all the grounds that he thought were appropriate. Id. The new trial motion set forth five grounds justifying a new trial,[5] including three instances of ineffective assistance of counsel.[6] CT at 1164–80. Mr. Moth's failure to include specific arguments favored by Petitioner

---

[5] The new trial motion asserted the following five grounds justifying a new trial: (1) juror hearing inadmissible evidence; (2) trial court error for failing to admit a prior conviction; (3) trial court error for prohibiting a self-defense argument; (4) ineffective assistance of counsel; and (5) prosecutorial misconduct for misstating the law. CT at 1164–79.

[6] The new trial motion asserted the following instances of ineffective assistance of counsel: (1) failure to impeach Rick's son, Patrick, with his inconsistent statements to Deputies Samples and

United States District Court
Northern District of California

does not constitute ineffective assistance of counsel.  See, e.g., Mayo, 646 F.2d at 375.  "The law does not require counsel to raise every available nonfrivolous defense." Knowles v. Mirzayance, 556 U.S. 111, 127 (2009).  The record supports the "'strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment." Cullen, 131 S. Ct. at 1407.

Moreover, even if Mr. Moth's performance had been deficient, Petitioner fails to show that he suffered actual prejudice from Mr. Moth's failure to include the above arguments in the new trial motion.  As discussed above, trial counsel's failure to impeach Rick with his prior statements regarding the shooting, to impeach Rick and James with the conduct underlying their convictions, and to cross-examine Rick and James regarding their application for victim-witness funds did not constitute ineffective assistance of counsel.  There is no indication that the trial court would have granted a new trial or called for an evidentiary hearing if Mr. Moth had included the above issues in his new trial motion.  This claim is denied.

C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

---

Dunia as to how many shots he heard; (2) failure to adequately cross-examine Patrick with his inability to identify Petitioner from a photo line-up on the night of the shooting; and (3) failure to impeach Rick with his testimony at an earlier trial that he went over to Jill's house to "take care of it."  CT at 1170–76.

1

## IV.  CONCLUSION

2     For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a

3  certificate of appealability is DENIED.

4     The Clerk shall enter judgment in favor of Respondent and close the file.

5     **IT IS SO ORDERED.**

6  Dated:  February 9, 2015

7  _____

8                                JON S. TIGAR
                              United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California